LASSER, P.J.T.C.
In this action, Transcontinental Gas Pipe Line Corporation (hereinafter taxpayer) contests the 1983 Bernards Township real property tax assessment on its gas transmission pipeline. At issue is the proper valuation of the pipeline for real property tax assessment purposes.
The present case was tried together with a companion case in which Algonquin Gas Transmission Company contested the 1983 Bernards Township real property tax assessment on its pipeline in the township. It was agreed that all testimony would apply to both cases. The Algonquin case is the subject of a separate opinion.
*512 Taxpayer owns and operates a pipeline system for the transportation of natural gas from wellheads in Texas and Louisiana to users in the middle Atlantic states region.[1] A portion of this pipeline system passes through Bernards Township. This portion consists of a 36-inch, high-pressure, steel-welded pipe, 22,315 lineal feet in length, in an easement 50 feet wide. The pipeline was constructed in 1959 and commenced operation in 1960. The original cost of taxpayer’s pipeline in Bernards Township is $1,045,252 ($46.84 a lineal foot).[2] It has been depreciated on the books of taxpayer and, as of the October 1, 1982 assessing date, had a net book value of $213,376 (20.4% of original cost; $9.56 a lineal foot).
A municipality-wide revaluation was adopted for Bernards Township for 1983 at 100% of value. Taxpayer’s 1983 real property tax assessment is $1,959,200 (Block 500, Lot 3). The 1983 tax rate is $1.77, and the 1983 tax is $34,677.84. Taxpayer’s 1982 assessment was $657,000, the tax rate $4.98, and the tax $32,718.60. The ratio of assessment to value in the taxing district in 1982 was 42%. In a deposition in evidence, the assessor testified that although he consulted other valuation sources, his method of establishing the 1983 assessment on the subject property was to select an assessment figure that would yield the same tax dollars for 1983 as taxpayer paid for 1982.
Prior to 1983, taxpayer’s property was assessed pursuant to a decision of the Appellate Division of the Superior Court of New Jersey in the case of Transcontinental Gas Pipe Line v. Bernards Tp., 115 N.J.Super. 593, 280 A.2d 689 (App.Div.1970), aff’d o.b. 58 N.J. 585, 279 A.2d 674 (1971), in which taxpayer *513 contested the 1967 assessment on its pipeline.[3] The Appellate Division upheld the Division of Tax Appeals’ use of a cumulative 3% annual deduction from historical cost for depreciation, the depreciation allowed by the Federal Power Commission, which then regulated taxpayer. The Appellate Division rejected application of a 25% appreciation factor. The Appellate Division stated:
One difficulty with the 37» depreciation method lies in the potentiality that, unless checked at some point, the cost figure minus the ever-increasing depreciation figure can become zero. As to Transcontinental, depreciation at 3% over a 16-year period has reached 48%. It would be unrealistic to continue this item unlimitedly to a point where theoretically the pipelines would have no value and would, in effect, be tax exempt.
Our concern is with the 1967 valuations. The issue of allowing further depreciation beyond the 487 figure has not been determined or briefed on this appeal. Accordingly, we make no determination as to the point when further depreciation should stop. As suggested by the State Division, the valuation of these pipelines should be considered by the Legislature and a suitable statewide formula enacted for universal guidance throughout the State. Determining “per foot cost” by dividing the cost of the “spread” in New Jersey by the footage in the spread is not, absent a showing of special circumstances, unreasonable. [115 NJ.Super. at 599, 280 A.2d 689]
In its conclusion the court stated,
the local assessments for the purpose of taxing Transcontinental pipelines will be calculated by taking the historical cost of each kind of pipeline as per the figures noted above; then deducting 37* per annum cumulatively but not exceeding 487» pending clarifying legislation or a more suitable record than that before us, and after that applying the particular municipal ratio used in assessing other properties in the municipality. [Id. at 599-600, 280 A2d 689]
The earnings and costs of natural gas transmission companies are regulated by the Federal Energy Regulatory Commission (FERC), successor to the Federal Power Commission. The rate base limits the rates consumers may be charged for gas transmissions. The rate base is the net book value (depreciated historical cost[4]) of the property of the transmission system. *514 The rate charged also includes expenditures for services to the system such as salaries and operating expenses, including taxes.
The appraisal experts agreed that the highest and best use of the property is as a gas transmission line. They agreed that the quest was for the fair market value of the property. Taxpayer’s expert used the unit valuation method, valuing the entire system and then allocating a portion of the total value to the Bernards Township property. The system was valued as regulated by FERC.
The unit valuation method values the entire property without reference to the value of component parts and then allocates to the subject property an appropriate percentage of the total value. The underlying theory is that a pipeline must operate as an entire unit to produce earnings and an isolated section of pipeline disconnected from the rest of the system would be without value.
Taxpayer’s Valuation
After analyzing the sales of 12 natural gas pipelines throughout the United States, taxpayer’s expert concluded that pipeline systems generally sell at a price close to net book value, calculated using depreciated historical cost. The sole exception that taxpayer’s expert found was a 1978 sale by Arapahoe Pipe Line Company to Cities Service Gas Company. In that case, FERC allowed the sale at a price 616.67% above net book value because the buyer’s customers were different from those of the seller, the property purchased had been regulated by the ICC, not FERC, and the new customers would not be paying again for property they had already paid for.
Taxpayer’s expert relied primarily on the income approach and, secondarily, on the cost approach. He testified that the 12 gas transmission system sales supported his income and cost approach conclusions because the sale prices and his values were close to net book value, but he did not regard these sales as sufficiently comparable to be used to arrive at a market approach value.
*515 His income approach consisted principally of two elements: (1) net operating income of the system before debt service and dividends, as taken from the books of the company prepared in accordance with FERC accounting requirements and adjusted to reflect projected future earnings and (2) a capitalization rate.
This expert estimated the future annual net utility operating income at $199,600,000 based on a five-year average net utility operating income, adjusting for income attributable to a recent rate increase and construction work in progress. He derived his capitalization rate of 12.90% by melding long-term debt interest, preferred stock dividend rate and equity return, as follows:
% of Capital Rate Structure
Long-term debt 57.43% X 11.03% = 6.33%
Preferred stock 11.80% x 9.55% = 1.13%
Common stockholders’ equity 30.77% x 17.75% = 5,46%
12.92% say 12.90%
The long-term debt rate of 11.03% and the preferred stock rate of 9.55% are the weighted average interest and dividend rates of taxpayer’s long-term debt and preferred stock as of October 1, 1982. The stockholders’ equity rate was derived from the expert’s discounted cash flow analysis and risk premium analysis. His discounted cash flow analysis took into consideration the current stock market price per share of utility companies,[5] the projected next year’s dividend and the growth rate of dividend. He concluded from this analysis that an investor would require a return of 17.56%.[6] His risk premium *516 analysis added 8.3% to the three-month and six-month treasury bill rates and 5% to the yield on Baa-rated public utility bonds. From these calculations he concluded that the equity investor would require a return on his investment of 17.75%.
Capitalizing the $199,600,000 annual income figure at 12.9% resulted in a value by the income approach for the entire transmission system of $1,547,300,000 (rounded). Taxpayer’s expert arrived at a cost approach value of $1,519,800,000 (rounded) for the entire system, using historical cost less depreciation for the tangible assets and adding the cost of construction work in progress, gas stored underground and materials and supplies. Considering his income and cost approach values, he concluded that the value of the system is $1,540,000,000. Allocation of this value to the 22,315 feet of pipeline in Bernards Township was accomplished as follows:
Total system fair market value $1,540,000,000
Allocation factor for Bernards Tp. ($213,376 -T- $1,519,821,756)[7] .014040
Indicated fair market value of property in Bernards Township $216,216
Rounded $216,000
The expert’s value for the Bernards Township portion of the pipeline is 1.3% in excess of its net book value.
Taxing District’s Valuation
The expert for the taxing district used only the cost approach to estimate the value of the subject property. He rejected the market approach for lack of comparable sales, as did taxpayer’s expert, and rejected the income approach because of the “lack of pertinent data” and because “no method for estimating the economic rent of the pipeline was available.”
*517 In his cost approach valuation this expert relied on the Marshall Valuation Service for the cost a lineal foot of 36" pipeline. From this service he obtained the March 1984 cost of $206 a foot, which he converted to October 1982 cost by using the Marshall Valuation Service cost index for October 1982 and October 1984 to obtain a factor of .955. He derived a cost of $196.73 a foot from these figures ($206 x .955 = $196.73), which he rounded to $197.[8] He confirmed the Marshall Valuation Service pipeline cost with the pipeline construction cost of $159.13 a foot for a 30" pipeline furnished to several assessors by R.S. Chisholm, a representative of Algonquin Gas Transmission Co., at a meeting held on March 16, 1983 to discuss the 21.1 miles of pipeline constructed in 1982 in Somerset and Hunterdon Counties.
The cost approach valuation calculations of the taxing district’s expert are as follows:
22,315 lineal feet at $197 a foot $4,396,055
Less 22% depreciation (1% a year assuming a 100-year life) 967,132
Depreciated value $3,428,923
rounded to $8,429,000
This expert did not allow any deduction for functional or economic obsolescence. He added $10,000 as a nominal value for the easement.
This expert was of the opinion that the subject property was special-purpose property which, of necessity, must be valued by the cost approach because there is no market from which to derive comparable sales, comparable rents or capitalization rates for pipelines. Without this information, he stated, no market or income approach analysis can be made.
*518 Discussion
The keystone of New Jersey’s real property tax system is uniformity. N.J. Const. (1947), Art. VIII, § 1, par. 1(a). All taxable property must bear its proportionate share of the burden of the cost of government. Lake End Corp. v. Rockaway Tp., 185 N.J.Super. 248, 253, 448 A.2d 475 (App.Div.1982). Uniformity of assessment is achieved by assessing all property subject to tax at its full and fair value, as required by N.J.S.A. 54:4-23, i.e., that price at which a willing seller will sell and a willing buyer will buy, neither being compelled to buy or sell. Fair market value is the standard of assessment. It is determined from one or more of the three traditional approaches to value: the market approach, which compares arm’s-length sales in the market to the subject property; the income approach, which utilizes economic rent to determine how much a purchaser would pay for the property, and the cost approach, which derives value from cost.
The subject property is a pipeline. It is concededly subject to real property tax. Only valuation is at issue. The principal issue which emerges is whether to value the subject property as if regulated or unregulated and whether to use historical or current cost as a primary element in the valuation process.
Taxpayer’s expert relies most heavily on the income approach, using his income approach value to provide the depreciation and obsolescence deductions in the calculation of the cost approach value. Taxpayer uses actual income, which income, in turn, is based upon the depreciated historical cost of the pipeline because it is historical cost that FERC uses to fix rates. The key to taxpayer’s valuation is thus historical cost—what the pipeline actually cost to build in 1959.
The taxing district relies solely on the cost approach, contending that the replacement cost in 1982 should be the beginning point of the cost approach valuation, with depreciation deducted from current cost based on the age of the property and a presumed 100-year life.
*519 The 1970 opinions of the Appellate Division in Transcontinental Gas Pipe Line Corp. v. Bernards Tp. and Texas Eastern Trans. Corp. v. Carteret Bor., both supra, do not address the valuation issue presented in the instant case. Both sides to the controversy in Transcontinental utilized historical cost minus depreciation to determine value, and agreed that neither the market data approach nor the income capitalization approach applied. 115 N.J.Super. at 597, 280 A.2d 689. No proof was submitted to the court on either of these approaches to value. Ibid. In Texas Eastern, the parties agreed that the market data approach was not applicable and that application of historical cost less depreciation was “reasonable.” 116 N.J.Super. at 16, 280 A.2d 833. The Transcontinental court acknowledged that “[o]ur concern is with the 1967 valuations,” 115 N.J.Super. at 599, 280 A.2d 689, and stated that “[t]he real issue was what percentage should be deducted from historical cost for the factor of depreciation.” Id. at 598, 280 A.2d 689. The Texas Eastern court said, “fpjresuming the correctness of these ‘cost’ figures used by the local assessors in their computations and the correctness of the footage of each kind of pipe in their respective municipalities, we find that the depreciation percentage, rather than ‘cost,’ presented the real basic issue.” 116 N.J.Super. at 15, 280 A.2d 833. The court accepted the 3% depreciation rate used by the Division of Tax Appeals but limited the depreciation to 48% of the historical cost.
The present case poses a distinctly different problem from that in the earlier cases, and those decisions do not preclude this court from taking a fresh look at the proper method of valuation to be used in valuing pipelines.
It is clear that a gas transmission pipeline is special-purpose property. It does not have a ready market for either sale or lease. There is no evidence that, if destroyed, the pipeline would not be reproduced in its present form. In Tenneco, Inc.—Tennessee Gas Pipeline Division v. Cazenovia, 104 A.D.2d 511, 479 N.Y.S.2d 587 (App.Div.1984), a case quite similar to the one at bar, the court held that the trial court correctly *520 valued a natural gas pipeline as special-purpose property. The court said,
The pipeline is unique and specially built for the purpose of transporting natural gas and is used for that purpose. There is no market for the type of property and there are no sales of property for such use. It could not be converted without substantial expenditures and it is an appropriate improvement, which if destroyed, would be reasonably expected to be replaced or reproduced. [479 N.Y.S.2d at 589; citation omitted]
The court responded as follows to the taxpayer’s argument that “since its income is based in part on the original cost of the pipeline less depreciation, the pipeline cannot have a fair market value derived by using a reproduction cost which is more than three times the original cost,” id,., at 590:
Petitioner’s income, while regulated, is not fixed; if, for some reason, petitioner were required to replace the pipeline at today’s costs, its rate base would increase and its rates would be allowed to increase to generate the necessary income to provide the approved rate of return. Thus, the value of the pipeline should not be limited by petitioner’s current income. [Ibid.]
This method of valuing gas pipelines has now been approved by the New York Court of Appeals. Brooklyn Union Gas Co. v. Equalization & Assessment Bd., 65 N.Y.2d 472, 492 N.Y.S.2d 598, 482 N.E.2d 77, rev’g 101 A.D.2d 909, 475 N.Y.S.2d 608 (App.Div.1984) and National Fuel Gas Distribution Corp. v. Equalization & Assessment Bd., 65 N.Y.2d 472, 492 N.Y.S.2d 598, 482 N.E.2d 77, rev’g 103 A.D.2d 187, 479 N.Y.S.2d 902 (App.Div.1984).
Since the pipeline is a special-purpose property, the cost approach will predominate. People ex rel. N.Y. Stock Exchange Bldg. Co. v. Cantor, 221 A.D. 193, 223 N.Y.S. 64 (App.Div.1927), aff’d mem. 248 N.Y. 533, 162 N.E. 514 (Ct.App.1928). Neither the market approach nor the income approach is an appropriate method for valuing the subject pipeline for real property tax assessment purposes.
Sales of pipeline systems occur from time to time, but because they usually involve the sale of the pipeline business operating in many states, including personal property, it is virtually impossible to extract from the total sale price of the business the sale price of the pipeline itself. For this reason, the market approach is of no assistance in valuing the subject.
*521 Similarly, the unit valuation method, a variation of the income approach used by taxpayer’s appraisal expert, values the entire pipeline system from an investor’s point of view. This method values the entire pipeline system as a business operating in many states, and then seeks to allocate out the portion of the pipeline located in Bernards Township. The basis for the valuation of the entire system is the income generated by the regulated rates paid by consumers, capitalized at a rate derived from interest on debt, dividends on preferred stock and a return on investors’ equity. The income is based in part[9] on asset values derived from historical cost less depreciation. The unit valuation method may be appropriate for valuing the system from the point of view of equity investors, but since it assumes that the pipeline’s current value is its historical cost less depreciation, this method is at variance with the accepted income approach to value real property for real property tax assessment purposes. The accepted method of valuation by the income approach is to capitalize the economic rent of the real property separate from the value of the business using the property.
The fact that taxpayer is permitted to include its cost of services in establishing the rate to be charged consumers is significant in determining the appropriateness of taxpayer’s unit valuation method. Local property taxes are included in the cost of services. Federal Power Com. v. Hope Nat. Gas Co., 320 U.S. 591, 614, n. 24, 64 S.Ct. 281, 293 n. 24, 88 L.Ed. 333 (1943). There is no evidence that properly assessed real property taxes imposed by Bernards Township will not be allowed as a cost of services in establishing the rate and thus be passed through to the consumers. Therefore, there is no economic effect on equity investors because they do not have to bear the cost of real property taxes. Regulation of the rate by use of depreciated historical cost is a benefit to the consumer because it relieves the consumer from having to pay twice for the same *522 asset,[10] but the pass-through of real property taxes provides a means for consumers to pay their fair share of the local property taxes imposed on property which they use. For consumers to pay their fair share, the property must be valued in accordance with the same standard of assessment applied to all other taxpayers in the taxing district. This does not mean, as taxpayer suggests, that the tax assessor can choose “any tax assessment.” Only a proper tax assessment made in accordance with constitutional and statutory standards is permissible.
The taxing district points to a parallel between real property taxes and royalty payments under gas production leases, citing Holmes v. Kewanee Oil Co., 233 Kan. 544, 664 P.2d 1335 (Sup.Ct.1983), Montana Power Co. v. Kravik, 179 Mont. 87, 586 P.2d 298 (Sup.Ct.1978), and Lightcap v. Mobil Oil Co., 221 Kan. 448, 562 P.2d 1 (Sup.Ct.1977), cert. den. 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156 (1978). In those cases, the gas producers argued that royalty payments to lessors under royalty leases are limited by the Federal Power Commission-imposed restrictions on rates the producers could charge. In Lightcap, the, court rejected that argument, explaining that
[t]he royalties to be paid are first to be determined under state law, based on the terms of the lease. The royalties so determined then become a component cost, to be considered by the FPC in determining the rates it will permit [defendant] to charge. In this respect royalties paid are costs to a gas producer____ [562 F.2d at 8]
The court held that “the existence of federal regulation over the rates which a gas producer may receive is no obstacle to the fixing of a higher rate as the ‘market value’ of the gas it sells for the purpose of computing royalties.” Ibid. Similarly, in the case at bar, real property taxes are to be determined under the accepted valuation standards of local law, and the taxes, once determined, will be part of taxpayer’s costs when FERC sets the rates taxpayer may charge.
*523 The issue here is valuation for real property tax purposes, not valuation for regulation or rate-paying purposes. I conclude that it is improper to value the system on an income basis which values the business, not the pipeline, and which values the debt and equity interests but ignores the benefit to the consumer and the requirement that all real property be assessed on a uniform basis.
The cost approach is the proper approach to be used in the valuation of this special-purpose pipeline property in Bernards Township. Both appraisal experts used the cost approach. Taxpayer’s cost approach value was based on the 1959 historical cost of the property. This 1959 cost of $1,045,252 was then depreciated to arrive at a depreciated historical cost of $213,376 as of October 1, 1982. Taxpayer thus urges a cost approach value of the pipeline of $213,376, a figure depreciated 79.6% below the 1959 cost. Does taxpayer have the right to have its property valued at its 1959 historical cost less depreciation when the cost approach standard of value for all other property in the taxing district is current cost less depreciation?
The principle of uniformity of assessment mandated by the New Jersey Constitution and statutes dictates that the same assessment principles be applied to all real property subject to taxation. In the absence of state statutory law to the contrary, the cost approach used for real property tax assessment purposes utilizes current cost, arrived at either by current replacement or reproduction cost or by historical cost trended to current cost. Cost approach valuation does not use historical cost depreciated. Current cost is the method used in the state-issued Real Property Appraisal Manual for New Jersey Assessors and in the standard textbook on appraising, American Institute of Real Estate Appraisers, The Appraisal of Real Estate~(8 ed. 1983). The cost approach has frequently been cited with approval by our courts. For example, Bostian v. Franklin State Bank, 167 N.J.Super. 564, 401 A.2d 549 (App.Div.1979), on remand 1 N.J.Tax 270 (Tax Ct.1980), aff’d 179 N.J.Super. 174, 2 N.J.Tax 391, 430 A.2d 1140 (App.Div. *524 1980); Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481 (Tax Ct.1983); Wayne Mall Inc. v. Wayne Tp., 2 N.J.Tax 1 (Tax Ct.1980); RCA Corp. v. East Windsor Tp., 1 N.J. Tax 481 (Tax Ct.1980).
Support for the use of current cost as a beginning point for the cost approach can be found in the case of Public Service Elec. & Gas Co. v. Woodbridge Tp., 139 N.J.Super. 1, 351 A.2d 799 (App.Div.1976), mod. on other grounds, 73 N.J. 474, 375 A.2d 1165 (1977). The Legislature has exempted the production and transmission facilities of certain public utility companies from real property tax and, instead, has subjected these facilities to the public utilities gross receipts tax. The Appellate Division in Public Service held that even with respect to such utilities, the Gross Receipts Tax Act, N.J.S.A. 54:30A-52, “requires utility-owned real estate subject to local taxation to be taxed in the manner provided by law for the taxation of all similar property owned by other corporations or individuals.” 139 N.J.Super. at 18, 351 A.2d 799. Even though the utilities are regulated, such real property is valued on an unregulated basis. The real property, although a part of the rate base, is given a fair market valuation as if unregulated.
The taxpayer in Public Service relied upon the opinion in Transcontinental Gas Pipeline Corp. v. Bernards Tp., supra, in urging that its property be valued at its historical cost less depreciation. The Appellate Division, in Public Service, rejected the taxpayer’s argument and held that the statute mandates that the company’s non-exempt real property be valued in the same manner as other real property in the taxing district, that is, by use of current cost. This holding was affirmed by the Supreme Court.
Taxpayer contends that it will be assessed in accordance with the same standard of value as other taxpayers only if its property is valued for assessment purposes at historical cost less depreciation, because the property is only worth what it will earn and its earnings are limited by FERC regulation. Similar arguments were rejected in Public Service Company v. *525 New Hampton, 101 N.H. 142, 136 A.2d 591 (Sup.Ct.1957); Maine Consolidated Pow. Co. v. Inhabitants of Town, 219 A.2d 748 (Me.Sup.Ct.1966); Town of Barnet v. New England Power Co., 130 Vt. 407, 296 A.2d 228 (Sup.Ct.1972), and Consumers Power Co. v. Port Sheldon Tp., 91 Mich.App. 180, 283 N.W.2d 680 (App.Ct.1979), all of which held that regulated public utility property is to be valued for local property tax assessment purposes by using current cost less depreciation.
In support of its argument, taxpayer cites the Appellate Division decisions in Brooklyn Union Gas Co. v. Equalization & Assessment Bd. and National Fuel Gas Distribution Corp. v. Equalization Bd., both supra. Taxpayer’s reliance on the decisions in those cases has been undercut by the recent reversals of the Appellate Division by the New York Court of Appeals.
Taxpayer also relies on Banquete Indep. Sch. Dist. v. Tenneeo, Inc., 618 S.W.2d 824 (Tex.Ct.Civ.App.1981). This case lends no support to taxpayer’s position. In Banquete, the court declined to overturn a jury finding that it preferred the historical cost approach to the income approach, for the simple reason that testimony by the taxpayer’s expert on depreciated historical cost “constituted some evidence which the jury was entitled to consider in determining the market value of the property in question, and it was within the province of the jury to determine the weight to be given [the expert’s] testimony.” Id. at 828. The court did not specifically approve of the use of the depreciated historical cost method to value a pipeline.
It should also be noted that taxpayer’s expert was of the opinion that taxpayer’s pipeline in Bernards Township would always have a residual value of 20-25% of its historical cost even if it were fully depreciated. He arrived at this conclusion based on the fact that, at the least, the pipeline would always connect the two parts of the system, which would produce this residual value. This position is inconsistent with taxpayer’s theory that the subject property should be valued on a system-wide basis at its depreciated historical cost. If the subject *526 pipeline, and presumably other portions of the system that have become fully depreciated, are no longer in the rate base but retain a fair market value separate from their rate base value, the rate base value cannot be the fair market value of the property.
Conclusion
I find that for tax assessment purposes the subject property must be valued in the same manner as other real property in the taxing district. This requires the property to be valued on an unencumbered, unregulated basis. Glenwood Realty Co. v. East Orange, 78 N.J.Super. 67, 187 A.2d 602 (App.Div.1963). It also requires that economic rent, not actual rent, be the basis for valuation approaches which rely on income that the property is capable of producing. Parkview Village Assocs. v. Collingswood Bor., 62 N.J. 21, 297 A.2d 842 (1972). The use of depreciated historical cost as a basis for valuation by the income and cost approaches conflicts with constitutional and statutory uniformity requirements.
Uniformity requires like property to be valued and assessed in the same manner. For example, oil pipelines are not regulated.[11] If gas pipelines were to be valued on a regulated basis, as taxpayer contends, similar pipelines running side by side, one gas and the other oil, would be valued and assessed differently. Even two gas pipelines running side by side would be valued differently if valued on a regulated basis, depending on the date of construction and business-related variables such as debt-to-equity ratios and managerial ability. The New York court in Tenneco v. Cazenovia, supra, pointed out that if a pipeline were replaced at today’s cost, its rate base would increase and, on a regulated basis, the pipeline would be valued at its current cost. While uniformity of valuation is not a *527 necessity for rate-making purposes, it is a necessity for real property tax assessment purposes. Since pipelines are special-purpose properties, and all similar pipelines should be valued similarly, the cost approach utilizing current cost as the starting point must be used so that the burden of real property taxation can be fairly shared.
I agree with both experts that the market approach is inapplicable, and I agree with the taxing district’s expert that the economic rent and market capitalization rate information is insufficient to value the property by the income approach. Taxpayer’s expert valued the property solely on a regulated basis, and I must therefore reject both his income approach and his cost approach because neither reflects that portion of the value representing the difference between the 1959 and 1982 costs.
Taxpayer’s expert indicated that the regulated and unregulated values might be approximately the same if the unregulated rates were the same as regulated rates. The expert did not value the property as if the rates were unregulated, and there is no evidence from which I can conclude that unregulated rates would be the same as the regulated rates now being paid.
I conclude that taxpayer, in valuing the subject property on a regulated basis, has not borne its burden of establishing the value of the property for New Jersey real property tax assessment purposes. I conclude that the appraisal expert for the taxing district correctly utilized the replacement cost approach in valuing the property, but I find that his depreciation allowance, which is based on an economic life of 100 years, is excessive. However, there is not sufficient evidence in the record from which I can conclude a proper economic life, and therefore I must reject the taxing district’s expert’s opinion of value.
I find that taxpayer has not borne its burden of proving that the assessment is incorrect. Since the taxing district has not filed a counterclaim seeking an increase in taxpayer’s assessment, and since 1983 is a revaluation year for the taxing *528 district, there could be no increase in the assessment even if the taxing district had established a value higher than the assessment. F.M.C. Stores Co. v. Boro. of Morris Plains, 195 N.J.Super. 373, 479 A.2d 435 (App.Div.1984), leave to appeal granted 99 N.J. 189, 491 A.2d 691 (1984).
The 1983 assessment is affirmed, and the Clerk of the Tax Court is directed to enter a judgment accordingly.

 As of December 31, 1982 taxpayer’s pipeline system consisted of 9,875.3 miles of pipeline, 269.7 miles of field and storage lines, 72 compressor stations and storage facilities for liquefied natural gas.

 This cost is the average cost a lineal foot of the 328,615 feet of pipeline that make up the "spread" of which the pipeline in Bernards Township is a part. Taxpayer presented evidence of the many variables that affect pipeline construction cost and make it difficult to determine the exact value of each section of pipeline.

 Texas Eastern Trans. Corp. v. Carteret Bor., 116 N.J.Super. 9, 280 A.2d 833 (App.Div.1970), aff'd o.b. 58 N.J. 585, 279 A.2d 674 (1971) was the companion case to 'Transcontinental.

 historical cost is original cost to the first owner.

 Presumably as of the assessing date, although not so stated.

 I note that the appraisal expert for Algonquin Gas Transmission Company, using the same discounted cash flow analysis formula, concluded that the equity investor would require a return of 15.5%.

 Net book value of taxpayer’s pipeline in Bernards Township divided by net book value of taxpayer’s entire pipeline system.

 The appraisal of the taxing district’s expert contained a mathematical error. This figure results from the correction of that error by the expert at trial.

 The remainder is cost of services.

 Compare the FERC approval of the 1978 sale by Arapahoe Pipeline Company to Cities Service Gas Company discussed supra at 514.

 Oil pipelines were formerly regulated by the Interstate Commerce Commission but have been unregulated for several years. When they were regulated, oil companies were permitted to value their pipelines at their appreciated value for rate-base purposes.